# UNITED STATES BANKRUPTCY APPELLATE PANEL

# OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP Nos. SC-11-1344-MkDJu |
| | SC-11-1377-MkDJu |
| ADOLFO CASTILLO, JR., and ANA CASTILLO, | |
| | Bk. No. 09-02350 |
| Debtors. | Adv. No. 09-90301 |
| ANA CASTILLO, | |
| Appellant and Cross-Appellee, | |
| v. | **MEMORANDUM**[*] |
| GREGORY AKERS, Chapter 7 Trustee of the Bankruptcy Estate of William Juarez, | |
| Appellee and Cross-Appellant. | |

Submitted Without Oral Argument
On May 1, 2012[**]

Filed: August 24, 2012

Appeal From The United States Bankruptcy Court
for the Southern District of California

Honorable James W. Meyers, Bankruptcy Judge, Presiding

Before:  MARKELL, DUNN and JURY, Bankruptcy Judges.

---

[*]This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

[**]On March 5, 2012, the Panel unanimously determined that oral argument was unnecessary and granted Appellee's motion to submit on the briefs.

**INTRODUCTION**

Ana Castillo's step-father filed a chapter 7[1] bankruptcy, and his chapter 7 trustee Gregory Akers obtained a fraudulent transfer judgment against both Ms. Castillo and her husband Adolfo. The Castillos then filed their own bankruptcy, so Mr. Akers filed a complaint in the Castillos' bankruptcy case objecting to their discharge under § 727(a) and seeking to except his judgment against the Castillos from discharge under § 523(a).[2]

After trial, the bankruptcy court granted relief under § 523(a)(4) as against Ms. Castillo only, but denied any relief under § 727(a). Both sides appealed. While we AFFIRM the court's § 727(a) ruling, we VACATE and REMAND the bankruptcy court's § 523(a)(4) ruling for the reasons stated below.

**FACTS[3]**

Monica and William Juarez are Ms. Castillo's elderly mother and step-father. In or around 2004, the Juarezes sold their home

---

[1]Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all Rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. All Civil Rule references are to the Federal Rules of Civil Procedure.

[2]Mr. Akers, who is the appellee and cross-appellant herein, is not your garden-variety judgment creditor. As a chapter 7 trustee, he had a statutory obligation to collect and reduce to money all assets of the bankruptcy estate, including the judgment. See § 704(a)(1).

[3]Unless otherwise indicated, the facts set forth herein are undisputed, and many are drawn from the bankruptcy court's memorandum decision entered in Akers v. Castillo (In re Juarez), Adv. No. 07-90901 (Feb. 5, 2009) ("Fraudulent Transfer Action").

2

in San Diego, California to the Castillos for a purchase price of $400,000. The net sale proceeds of $155,000 ("Proceeds") were deposited in a joint bank account ("Joint Account") in which the Juarezes and Ms. Castillo were named account holders.

Mr. Juarez had a gambling problem. By way of the sale, the Juarezes hoped to prevent Mr. Juarez from gambling away the equity in his home. The Juarezes and the Castillos intended to use the Proceeds to construct an additional rental unit on the same lot on which the home was located. They all hoped to generate enough rental income from the additional unit to make monthly payments on the mortgage the Castillos took out when they purchased the home and to cover the Juarezes' future living expenses.[4]

However, in addition to using some of the Proceeds to begin work on the rental unit, the Proceeds also were used to make mortgage payments, to pay monies owed to relatives, or as gifts to other relatives. On May 31, 2006, after Mr. Juarez withdrew some of the Proceeds from the Joint Account to gamble, Ms. Castillo transferred ("May 31 Transfer") the remaining balance of the Proceeds, $92,000, from the Joint Account to another bank account solely in her name ("Castillo Account").

The rental unit was never built. After the May 31 Transfer, Ms. Castillo paid most of the remaining proceeds to the Castillos' mortgage lender, to other relatives, and to

---

[4]The Castillos and the Juarezes intended that the Juarezes would continue to live in the home, and the Juarezes did continue to live there after the sale closed. For a time, the Juarezes paid $500 per month in rent to the Castillos.

3

contractors to pay for remodeling and redecorating the home. Of the $92,000, roughly $13,000 was used to pay off some of Mr. Juarez's creditors. Ms. Castillo declined to pay other creditors of Mr. Juarez from the remaining Proceeds, which ultimately led Mr. Juarez to file an individual chapter 7 case in March 2007.

Mr. Akers was appointed to serve as the chapter 7 trustee in Mr. Juarez's bankruptcy case. Mr. Akers demanded that Ms. Castillo turn over the $14,000 in Proceeds remaining at the time Mr. Juarez filed bankruptcy, which she did. Mr. Akers also commenced the Fraudulent Transfer Action against the Castillos, in which he alleged that the sale of the home and the disposition of the Proceeds constituted both intentional and constructive fraudulent transfers.

After trial, the bankruptcy court issued its memorandum decision in February 2009, in which it ruled that none of the alleged transfers were made with the intent to hinder, delay or defraud Mr. Castillo's creditors and that the sale of the home was not a constructive fraudulent transfer. However, the court also ruled that the May 31 Transfer was a constructive fraudulent transfer. According to the court the May 31 Transfer rendered Mr. Juarez insolvent.

The bankruptcy court credited against the $92,000 transferred into the Castillo Account the $13,000 paid to Mr. Juarez's creditors prepetition and the $14,000 paid over to Mr. Akers postpetition. However, the court refused to give the Castillos any credit for mortgage payments, payments to relatives and payments to contractors. According to the court, the

4

mortgage payments and the contractor payments primarily benefitted the Castillos because they now owned the home. Based on these rulings, the court entered judgment in favor of Mr. Akers and against the Castillos in the approximate amount of $65,000, plus interest ("Fraudulent Transfer Judgment"). Neither side appealed the Fraudulent Transfer Judgment.

Within days of entry of the Fraudulent Transfer Judgment, the Castillos filed their own chapter 7 bankruptcy case, and Gerald Davis was appointed as their chapter 7 trustee.[5] In July 2009, Mr. Akers commenced an adversary proceeding objecting to the Castillos' discharge under §§ 727(a)(2), (a)(3), (a)(4)(A), (a)(4)(D) and (a)(5), and also claiming that the Fraudulent Transfer Judgment should be excepted from discharge under §§ 523(a)(2), (a)(4) and (a)(6) ("Discharge Action").[6]

In relevant part, with respect to the § 523(a)(4) claim, Mr. Akers alleged that "the indebtedness owed to Trustee Akers [on account of the Fraudulent Transfer Judgment] in whole or in part constitutes funds of an express trust and arises from a

---

[5]The Castillos' converted their chapter 7 case to chapter 13 in March 2010, but the case was reconverted to chapter 7 in January 2011.

[6]The § 523(a)(4) claim only named Ms. Castillo as a defendant. The record arguably suggests that Mr. Akers abandoned his two claims under § 523(a)(2) and (a)(6), but the court never entered a final judgment disposing of these latter two claims. Instead, the court's amended judgment entered on April 17, 2012, only explicitly disposed of the § 727(a) claims and the § 523(a)(4) claim. The amended judgment also contained a statement pursuant to Civil Rule 54(b) indicating that there was no just cause for delay in entering a final judgment disposing of the § 727(a) claims and the § 523(a)(4) claim.

defalcation of fiduciary duty and failure to turnover and account for such funds." Complaint Objecting to Discharge and Dischargeability of Debt (Jul. 27, 2009) at ¶ 48.

With respect to the § 727(a) claims, Mr. Akers alleged that the Castillos: (1) were slow to produce and/or failed to produce critical financial records despite numerous requests; (2) made a number of asset transfers to their relatives, for which they received no value in exchange; (3) failed to disclose any of these transfers in their bankruptcy schedules and statement of financial affairs; (4) concealed some of these transfers despite being questioned under oath at their § 341(a) meeting of creditors; and (5) engaged in all of the above conduct with the intent to hinder, delay or defraud Mr. Akers as their creditor.

Shortly before trial in the Discharge Action, the bankruptcy court issued a notice in which it framed the issues for trial and tentatively stated its view of Mr. Akers' documentary evidence submitted in advance of trial.[7] Among other things, the court indicated that, in large part, Mr. Akers' case was based upon the prior Fraudulent Transfer Judgment. Specifically with respect to the § 523(a)(4) claim, the court stated:

> The final claim is to except [the Fraudulent Transfer Judgment] from discharge under § 523(a)(4). After presiding at the trial [in the Fraudulent Transfer Action], this Court is familiar with the underlying facts and the resulting judgment. The funds Ana Castillo moved from the joint account with William Juarez to her individual account was money held in trust for William Juarez. The issues remaining for trial on that claim will focus on whether there was a defalcation by Ana Castillo in her role as the trustee of that trust.

---

[7]The same bankruptcy judge who presided over the Fraudulent Transfer Action presided over the trial of the Discharge Action.

Notice of Intended Trial Procedure (Jan. 21, 2011) at 2:17-24 (emphasis added).

The bankruptcy court conducted a one-day trial on January 26, 2011, during which it heard testimony from various witnesses and various exhibits were offered and admitted into evidence. We do not know what testimony was given or which exhibits specifically were offered into evidence because neither of the parties obtained the transcript from January 26, 2011.

But we have been provided with a transcript of the bankruptcy court's January 27, 2011 oral rulings immediately following trial. The bankruptcy court held that it was going to overrule Mr. Akers' objections to the Castillos' discharge under § 727(a). In so holding, the court expressly stated that it was "convinced" by the Castillos' testimony that any errors or omissions by them in their chapter 7 case were the result of "innocent oversight and that they did not intend to deceive in any way." Trial Trans. (Jan. 27, 2011) at 3:23-25.

On the other hand, the court also ruled that it was inclined to grant Mr. Akers relief on his § 523(a)(4) claim. The court expressed a willingness to consider additional legal argument on the § 523(a)(4) claim because the relevant legal issues had not been adequately addressed in either the Fraudulent Transfer Action or in the Discharge Action, and because the Castillos did not have legal representation.

But the bankruptcy court opined that the evidentiary record from the Fraudulent Transfer Action appeared factually sufficient to support the § 523(a)(4) claim and that it was leaning toward holding that the Fraudulent Transfer Judgment was

nondischargeable as a defalcation by Ms. Castillo while acting in a fiduciary capacity:

> I think the facts are there, pretty much, so what I'm inclined to do is continue this hearing on just the 523 for six weeks and allow the parties, especially the debtors, to consult counsel and to see whether they would like to make – file a further pleading, that would have to be filed at least two weeks before the next hearing, indicating that they have any argument based on the record from the previous trial that [the Fraudulent Transfer Judgment] should not be excluded under 523 as a defalcation; in other words, it was monies held in trust, while they may or may not have been accounted for, they were not returned and, therefore, they would be excepted from the discharge.
>
>                     *     *     *
>
> The only question left is whether the actual debt as evidenced by the [Fraudulent Transfer Judgment] should be excepted from the discharge. At this point, I think on this record, where we really haven't spent that much time dealing [with] that question, I'd be inclined to say it is excepted on the face of it. But I'd be glad to hear further argument.

Trial Trans. (Jan. 27, 2011) at 4:17-5:3, 10:22-11:3 (emphasis added).

While the bankruptcy court was focused on additional legal argument, it also left open the possibility that it might hold a further evidentiary hearing: "And we'd have further argument on this. And it might even involve scheduling a short hearing on any further evidence that might come up." Trial Trans. (Jan. 27, 2011) at 5:5-7. The court later reiterated that it ultimately might decide to hold another evidentiary hearing in a scheduling order entered on May 2, 2011. In that order, the court further indicated that all § 523(a)(4) issues, including the fiduciary capacity and defalcation issues, were still open issues:

> As stated in the Notice of Intended Trial Procedure issued on January 21, 2011, it appeared to the Court that the funds Ana Castillo moved from the joint

8

account with William Juarez to her individual account was money held in trust for William Juarez. <u>However, the trust issues and any defalcation by Ana Castillo as trustee were not adequately addressed at the trial conducted in January, and the Court continued the case to allow the parties time to brief and present further evidence on the § 523(a)(4) issues.</u>

Order Setting Deadlines and Scheduling Final Pre-trial Conference on § 523(a)(4) issues (May 2, 2011) at 2:7-14 (emphasis added).

In her supplemental brief, Ms. Castillo argued: (1) that she had never served in a fiduciary capacity within the meaning of § 523(a)(4); and (2) that a defalcation had not occurred because she disbursed the funds in the Castillo account only with the express consent of Ms. Juarez, Mr. Juarez or both. Additionally, Ms. Castillo attempted to offer new evidence in the form of written declarations from both of the Juarezes, as well as excerpts from their deposition testimony.

In response, Mr. Akers objected to the new evidence on a number of different grounds. Among other things, he pointed out that the Castillos had not identified either of the Juarezes as witnesses despite having a duty to do so during discovery and later during pretrial proceedings. Mr. Akers also claimed that, even though he had previously taken the Juarezes' depositions in the Fraudulent Transfer Action, that action did not deal with § 523(a)(4), so he would be prejudiced by the admission of testimony from the Juarezes. Mr. Akers further argued that the Juarezes' prior deposition testimony was wholly inconsistent with their new declaration testimony. According to Mr. Akers, in the former, the Juarezes had testified to not knowing how Ms. Castillo had disbursed the proceeds. In contrast, in the latter, the Juarezes claimed that Ms. Castillo had requested and obtained

9

their express approval for the amounts disbursed from the Proceeds.

Mr. Akers also asserted, based largely on the undisputed facts set forth above, that Ms. Castillo had admitted in the Fraudulent Transfer Action that she was a trustee of an express trust, in which she held the Proceeds for the benefit Mr. Juarez, for the express purpose of building the additional rental unit. As Mr. Akers put it, Ms. Castillo's disbursal of the Proceeds for any other purpose violated the terms of the express trust.

The bankruptcy court held its final hearing, which the court had designated as a pretrial conference, on June 3, 2011. After giving the parties the opportunity to discuss the arguments they had made in their briefs, the court stated that it would not benefit from hearing the additional evidence Ms. Castillo proposed to offer. Instead, the court ruled based on the evidence adduced and judgment entered in the Fraudulent Transfer Action that the Fraudulent Transfer Judgment would be excepted from Ms. Castillo's discharge under § 523(a)(4). According to the bankruptcy court:

> The judgment entered in the [Fraudulent Transfer Action] of 65,000 represents a series of transactions, and that judgment stands. I haven't –
>
> At this point the evidence [has] suggested that the [Fraudulent Transfer Judgment] should be excepted from the discharge; that there was a defalcation from someone in a position of trust; and they have not accounted for the use of these funds in any way that would absolve them. In other words, the funds were, to my eye and this record, were used for their personal benefit, even though it might, as a subsidiary matter, be to their parents. The long and the short of it is that I have to declare, at this point, that the debt is excepted from the discharge.

Hr'g Trans. (June 3, 2011) at 35:1-13. In so ruling, the court

10

apparently reasoned: (1) that the evidence from the Fraudulent Transfer Action was sufficient to establish that Ms. Castillo was a fiduciary, (2) that a fiduciary may never receive a benefit at the expense of the trust property, and (3) that for a trustee to receive such a benefit constituted defalcation per se. In the process, the court excluded the additional evidence Ms. Castillo had sought to offer and disregarded her claim that her disbursement of the proceeds had been authorized by the Juarezes.

The court entered a judgment denying Mr. Akers any relief on his § 727(a) claims, but declaring the Fraudulent Transfer Judgment excepted from discharge under § 523(a)(4). Ms. Castillo appealed the bankruptcy court's ruling on the § 523(a)(4) claim, and Mr. Akers cross-appealed the court's ruling on the § 727(a) claims.

### JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I) and (J). We have jurisdiction under 28 U.S.C. § 158.

### ISSUES

1. Did the bankruptcy court err when it granted a judgment in favor of Akers on his § 523(a)(4) Claim?

2. Did the bankruptcy court err when it denied relief to Akers on his § 727 Claims?

### STANDARDS OF REVIEW

In the context of an appeal from a nondischargeability judgment, we review the bankruptcy court's findings of fact under the clearly erroneous standard and its conclusions of law de novo. Honkanen v. Hopper (In re Honkanen), 446 B.R. 373, 382

11

(9th Cir. BAP 2011). But the ultimate question of whether a particular debt is dischargeable is a mixed question of fact and law that we review de novo. Id.; see also Searles v. Riley (In re Searles), 317 B.R. 368, 373 (9th Cir. BAP 2004) (stating that mixed questions are reviewed de novo when they require the court "to consider legal concepts and exercise judgment about values animating legal principles.").

We review the bankruptcy court's evidentiary rulings for abuse of discretion. See Johnson v. Neilson (In re Slatkin), 525 F.3d 805, 811 (9th Cir. 2008) (citing Latman v. Burdette, 366 F.3d 774, 786 (9th Cir. 2004)). "We afford broad discretion to a district court's evidentiary rulings. To reverse such a ruling, we must find that the district court abused its discretion and that the error was prejudicial. A reviewing court should find prejudice only if it concludes that, more probably than not, the lower court's error tainted the verdict." Harper v. City of Los Angeles, 533 F.3d 1010, 1030 (9th Cir. 2008)(citations and internal quotation marks omitted).

Under the abuse of discretion standard of review, we first "determine de novo whether the [bankruptcy] court identified the correct legal rule to apply to the relief requested." United States v. Hinkson, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc). And if the bankruptcy court identified the correct legal rule, we then determine under the clearly erroneous standard whether its factual findings and its application of the facts to the relevant law were: "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." Id. (internal quotation marks omitted).

12

As for judgments on objections to discharge, "(1) the court's determinations of the historical facts are reviewed for clear error; (2) the selection of the applicable legal rules under § 727 is reviewed de novo; and (3) the application of the facts to those rules requiring the exercise of judgments about values animating the rules is reviewed de novo." In re Searles, 317 B.R. at 373.

**DISCUSSION**

**A.   Section 523 (a)(4) nondischargeability ruling.**

**1.   Section 523(a)(4), generally.**

In pertinent part, § 523(a)(4) excepts from discharge debts incurred for "for fraud or defalcation while acting in a fiduciary capacity." § 523(a)(4). The term "fiduciary" is narrowly defined for purposes of § 523(a)(4). In re Honkanen, 446 B.R. at 378 (citing Cal–Micro, Inc. v. Cantrell (In re Cantrell), 329 F.3d 1119, 1125 (9th Cir. 2003)). In order for there to be liability under § 523(a)(4), the debtor's fiduciary capacity "must arise from an express or technical trust that was imposed before, and without reference to, the wrongdoing that caused the debt . . . ." In re Cantrell, 329 F.3d at 1125 (citing Lewis v. Scott (In re Lewis), 97 F.3d 1182, 1185 (9th Cir. 1996)). A trust "ex maleficio" will not suffice. In re Honkanen, 446 B.R. at 379. Moreover, "[t]he broad, general definition of fiduciary - a relationship involving confidence, trust and good faith - is inapplicable in the dischargeability context." In re Cantrell, 329 F.3d at 1125 (quoting Ragsdale v. Haller, 780 F.2d 794, 796 (9th Cir. 1986)).

Meanwhile, for purposes of § 523(a)(4), "defalcation" means

13

either a "misappropriation of trust funds or money held in any fiduciary capacity" or a "failure to properly account for such funds." <u>Blyler, et al. v. Hemmeter (In re Hemmeter)</u>, 242 F.3d 1186, 1190 (9th Cir. 2001).

**2. Exclusion of Ms. Castillo's additional evidence.**

Both in the bankruptcy court and on appeal, Ms. Castillo has argued that she did not have the type of fiduciary relationship with respect to the Proceeds that would qualify her as a fiduciary within the meaning of § 523(a)(4). She also has argued that there was no defalcation within the meaning of § 523(a)(4). In support of her arguments, her opening appeal brief largely relies on the additional evidence she sought to offer in the bankruptcy court, particularly the declaration of Monica Juarez. Liberally construing her appeal brief,[8] Ms. Castillo in essence claims that the bankruptcy court erred when it declined to consider her additional evidence. In his responsive brief on appeal, Mr. Akers argued at length that Ms. Castillo's additional evidence, particularly the Juarezes' declarations, were irreconcilably inconsistent with the evidence presented in the Fraudulent Transfer Action. He also reiterated that Ms. Castillo did not identify the Juarezes as witnesses during discovery or pretrial in the Discharge Action.

But the bankruptcy court did not exclude Ms. Castillo's additional testimony on any of the grounds articulated by Mr. Akers. Instead, the court simply ruled: "I do not believe the

---

[8]See <u>Balistreri v. Pacifica Police Dep't</u>, 901 F.2d 696, 699 (9th Cir. 1990) (holding that pro se appellate briefs should be liberally construed).

14

court would benefit from hearing other evidence." Hr'g Trans. (June 3, 2011) at 34:17-18. Based on this statement and our reading of the entire June 3, 2011 hearing transcript, we presume the court meant that Ms. Castillo's additional evidence was irrelevant in light of the grounds on which the court based its resolution of the fiduciary capacity and defalcation issues.[9]

### a. Relevancy of additional evidence to defalcation issue.

We will first look at the bankruptcy court's resolution of the defalcation issue and whether the court properly excluded the additional evidence on relevancy grounds in light of the court's defalcation ruling.

The bankruptcy court held that, regardless of whether the Proceeds had been accounted for and regardless of whether the Juarezes had authorized Ms. Castillo's use of the Proceeds for her own benefit, defalcation necessarily occurred because she used the Proceeds for her own benefit. While ordinarily a nondischargeable defalcation occurs when a trustee retains trust funds for his or her own benefit, see, e.g., Banks v. Gill Distribution Centers, Inc. (In re Banks), 263 F.3d 862, 865 (9th Cir. 2001); Lovell v. Stanifer (In re Stanifer), 236 B.R. 709, 719 (9th Cir. BAP 1999), there may be no defalcation if the retention was authorized, either by the terms of the trust or the consent of the beneficiaries. See RESTATEMENT (THIRD) OF TRUSTS

---

[9]When the basis for the court's evidentiary ruling is not fully articulated, we may infer the basis from the court's statements and the surrounding circumstances. See, e.g., Obrey v. Johnson, 400 F.3d 691, 694 (9th Cir. 2005); U.S. v. Cruz-Garcia, 344 F.3d 951, 955-57 & n.2 (9th Cir. 2003).

15

§ 78, comments c(2) and c(3) (2007).

Simply put, if the Juarezes duly authorized Ms. Castillo to keep the funds and use them for her own benefit, then there was no misappropriation, and hence no defalcation.

To analyze this proposition, we start with the dictionary definition of misappropriation. The dictionary definition that meshes best with § 523(a)(4) is the broadest one – "a wrong use."[10] The bankruptcy court in essence decided that any use of trust funds for the benefit of the trustee constituted a misuse and hence a misappropriation. But we simply cannot agree with the bankruptcy court's premise that a trustee automatically misuses trust funds whenever that trustee uses such funds for his or her own benefit, even when the settlor or the beneficiary has duly authorized that particular use. As we have indicated, under appropriate circumstances, the law of trusts permits either a settlor or a beneficiary to authorize a trustee to benefit from trust property. See RESTATEMENT (THIRD) OF TRUSTS § 78, cmts. c(2) and c(3) (2007).[11]

---

[10]We derive this definition from the Oxford English Dictionary, which defines misappropriation as "Appropriation of (something) for a wrong use; spec. the action or an instance of taking (funds, etc.) fraudulently or unfairly." (Emphasis added.)

[11]Indeed, a person may serve both as a trustee and a beneficiary under the same trust. See RESTATEMENT (THIRD) OF TRUSTS § 78 (referring to "[t]he common situation in which one or more of a trust's beneficiaries are selected or authorized by the settlor to serve as trustee or co-trustee"); see also RESTATEMENT (THIRD) OF TRUSTS § 32, comment b ("settlors often select beneficiaries as trustees or co-trustees, and the existence of conflicting interests is not ordinarily a basis for a court to remove (or deny appointment to) a trustee of the settlor's choice.")

16

Moreover, the Ninth Circuit has held that the meaning of defalcation for purposes of § 523(a)(4) does not include a diminution of trust assets resulting from actions the trustee explicitly was authorized to take. Blyler, et al. v. Hemmeter (In re Hemmeter), 242 F.3d 1186, 1191 (9th Cir. 2001). In Hemmeter, pension plan participants commenced an adversary proceeding against the debtor, alleging that losses suffered by the plans were nondischargeable debts of the debtor under § 523(a)(4). Id. at 1189. The employee plan participants further alleged that the plan losses resulted from the debtor's investment of plan funds in the stock of the employer company that had established the pension plans. Id. at 1191. In affirming the bankruptcy court's Civil Rule 12(b)(6) dismissal, the Hemmeter court pointed out that the plans specifically authorized plan fiduciaries to invest plan funds in the employer company's stock. Id. According to Hemmeter, the loss of the plan funds under the alleged circumstances, as a matter of law, could not have constituted a defalcation for purposes of § 523(a)(4) because the plans explicitly authorized the transactions that led to the losses. Id.[12]

Based on the Restatement and Hemmeter, we hold that the bankruptcy court erred as a matter of law when it declined to consider whether Ms. Castillo was authorized to use the Proceeds in the ways that she did. As a result, the court also erred when it excluded Ms. Castillo's additional evidence on relevancy

[12]Accord, Destfino v. Bockting, 2012 WL 258408 (9th Cir. Mem. Dec. Jan 30, 2012); see also In re Banks, 263 F.3d at 870 (indicating that beneficiary of trust may by agreement authorize the trustee to keep trust funds for the trustee's own benefit).

17

grounds. The Juarezes' declarations spoke directly to the issue of whether either or both of them had authorized Ms. Castillo to use the Proceeds for her own benefit. Accordingly, the bankruptcy court erred when it concluded that the additional evidence was irrelevant to the defalcation issue.[13]

###### b. Relevancy of additional evidence to fiduciary capacity issue.

The bankruptcy court relied upon the facts drawn from the Fraudulent Transfer Action to infer that Ms. Castillo was a fiduciary. Based on these facts, the court ruled that "there was a defalcation from <u>someone in a position of trust</u>." (emphasis added).[14] The court did not explain why it considered Ms.

---

[13]Mr. Akers has asserted that Ms. Juarez had no authority to direct Ms. Castillo regarding the use of the Proceeds because they were solely Mr. Juarez's property. Assuming without deciding that the Proceeds were Mr. Juarez's sole and separate property, he still may have authorized Ms. Juarez, as his agent, to direct Ms. Castillo as to how the Proceeds should be used. The undisputed facts on which both parties rely could support an inference of such authorization. On remand, the bankruptcy court will be free to address the ownership and authorization issues.

[14]On its face, this solitary statement is ambiguous as to the specific type of fiduciary the court found Ms. Castillo to be. It would have been relatively easy for the court simply to have stated that Ms. Castillo was the trustee of an express trust consisting of the Proceeds, which she held for Mr. Juarez's benefit. That is precisely what Mr. Akers alleged and argued throughout the Discharge Action. But the court used no such language. Instead, the court used language sounding more like a reference to a "position of trust and confidence" which in California can cause a generic fiduciary relationship to arise. <u>See, e.g.</u>, <u>Lewis v. LeBaron</u>, 61 Cal.Rptr. 903, 911 (Cal. Ct. App. 1967); <u>Sime v. Malouf</u>, 212 P.2d 946, 955 (Cal. Ct. App. 1949). These types of generic fiduciary relationships do not by themselves give rise to liability under § 523(a)(4). As the Ninth Circuit has repeatedly held, "[t]he broad, general definition of fiduciary - a relationship involving confidence,
(continued...)

18

Castillo's additional evidence irrelevant to this issue. As set forth above, the court merely stated "I do not believe the court would benefit from hearing other evidence." Hr'g Trans. (June 3, 2011) at 34:17-18.

We disagree with the bankruptcy court. If it had considered and credited the statements in the Juarezes' declarations regarding their directions on the use of the Proceeds, those facts would have tended to undermine Mr. Akers' claim that Ms. Castillo was the Trustee of an express trust.

To explain why this is so, we must look at the substantive law of trusts. In California, an express trust requires a settlor by acts or words to objectively manifest an intent to create a trust. See Lonely Maiden Prods., LLC v. GoldenTree Asset Mgmt, LP, 135 Cal. Rptr. 3d 69, 78 (Cal. Ct. App. 2011); Chang v. Redding Bank of Commerce, 35 Cal. Rptr. 2d 64, 70 (Cal. Ct. App. 1994); Petherbridge v. Prudential Sav. & Loan Ass'n, 145 Cal. Rptr. 87, 93 (Cal. Ct. App. 1978). The trustor's acts or words also must establish what property is subject to the trust, the trust's purpose, and the trust's beneficiary. See Chang, 35 Cal. Rptr. 2d at 70; Abrams v. Crocker-Citizens Nat'l Bank, 114 Cal. Rptr. 913, 915 (Cal. Ct. App. 1974).

Most importantly, in ascertaining the settlor's intent, all of the circumstances surrounding the transaction ordinarily should be considered. See Lonely Maiden Prods., 135 Cal. Rptr. 3d at 78; Petherbridge, 145 Cal. Rptr. at 93. The Juarezes'

---

[14](...continued) trust and good faith - is inapplicable in the dischargeability context." See In re Cantrell, 329 F.3d at 1125 (quoting Ragsdale v. Haller, 780 F.2d 794, 796 (9th Cir. 1986)).

various statements about what the Proceeds were supposed to be used for are directly relevant to the issue of the alleged trust's purpose and, indeed, whether Mr. Juarez intended to create a trust at all.[15] Moreover, even if we were to assume that a trust was created in the first instance, it also is possible that Mr. Juarez as settlor later modified or revoked the trust, either by directly authorizing alternate uses of the Proceeds, or indirectly through Ms. Juarez as his representative or agent.[16] Such modifications would not be unusual or unexpected when, as here, the trust allegedly was created through oral statements, and not by a written instrument.

Unless inadmissible on some other grounds, all relevant evidence generally is admissible. See Fed. R. Evid. 402; Shad v. Dean Witter Reynolds, Inc., 799 F.2d 525, 529 (9th Cir. 1986). Evidence is considered relevant if it has "any tendency to make a

---

[15]See generally id. at 97-98 (stating that the parties' conduct is often the most probative evidence of the intent to create a trust and holding that the parties' conduct was inconsistent with a trust relationship and the attendant legal consequences).

[16]On the settlor's power to revoke or modify an inter vivos trust, see generally RESTATEMENT (THIRD) OF TRUSTS § 63 (2003).
Akers strenuously and at length has asserted that the Juarezes' later statements regarding the use of the Proceeds were inconsistent with their earlier testimony, going so far as to characterize the later statements as a fraud on the court. However, notwithstanding Mr. Akers' presentation, it still is conceivable that the Juarezes might have been able to reconcile or at least explain the differences in their various statements if they had been given the opportunity to testify at a further evidentiary hearing. The bankruptcy court as the trier of fact needed to find whether the Juarezes' various statements regarding the Proceeds were credible. In other words, the issue of the Juarezes' veracity went to the weight and credibility that should be given to their declarations and not to their admissibility.

20

[material] fact more or less probable than it would be without the evidence." Fed. R. Evid. 401 (emphasis added); see also Shad, 799 F.2d at 529. Here, as explained above, Ms. Castillo's additional evidence was relevant to both the defalcation and fiduciary capacity issues. Consequently, the bankruptcy court erred when it excluded Ms. Castillo's additional evidence on relevancy grounds.

### 3. Harmless error.

Having determined that the bankruptcy court abused its discretion in excluding Ms. Castillo's additional evidence as irrelevant, we still must determine whether Ms. Castillo was prejudiced by the court's abuse of discretion. Harper, 533 F.3d at 1030; In re Slatkin, 525 F.3d at 811. An appellant has been prejudiced by the trial court's erroneous evidentiary ruling if it is more probable than not that the error tainted the trial court's decision. Molina v. Astrue, 674 F.3d 1104, 1119 (9th Cir. 2012); Harper, 533 F.3d at 1030.

In determining whether the error was prejudicial, we must look at the circumstances of the particular case. See Shinseki v. Sanders, 556 U.S. 396, 407-08, 129 S.Ct. 1696, 1704-05, 173 L.Ed.2d 532 (2009). More specifically, we must look at factors such as whether the evidence erroneously excluded was either tangential or cumulative, and also whether the overall strength of the case against Ms. Castillo was so great as to render the erroneously excluded evidence inconsequential. Molina, 674 F.3d at 1119. While the harmless error analysis sometimes may require a review of the entire record, the surrounding circumstances of the case often will make it clear to the appellate court "that

21

the ruling, if erroneous, was harmful and nothing further need be said." Shinseki, 556 U.S. at 410, 129 S.Ct. at 1706.

This is one of those cases where the prejudice to the appellant from the erroneous evidentiary ruling is rather obvious. As our above discussion of relevancy demonstrates, Ms. Castillo's additional evidence cannot be characterized as tangential. Nor can it be characterized as cumulative. "Cumulative evidence" is evidence which replicates other admitted evidence. U.S. v. Ives, 609 F.2d 930, 933 (9th Cir. 1979). Here, Mr. Akers' oft-repeated argument that the additional evidence was inconsistent with the evidence adduced in the Fraudulent Transfer Action belies any notion that the additional evidence could be considered cumulative.

Moreover, our view of the overall strength of Mr. Akers' case persuades us that his position was not so strong as to render Ms. Castillo's additional evidence inconsequential. The undisputed facts on which he relied to establish the existence of an express trust are not necessarily inconsistent with a mere agency relationship.[17] But an agency would have been insufficient by itself to impose liability under § 523(a)(4); as we previously stated, a debtor is not a fiduciary within the meaning of § 523(a)(4) unless he or she is trustee of an express or technical trust. In re Cantrell, 329 F.3d at 1125.

Indeed, our doubts regarding Mr. Akers' case are amplified by the apparent tension between the bankruptcy court's Fraudulent Transfer Judgment and its fiduciary capacity ruling.

---

[17]On the distinctions between trusts, agencies and agency-trusts, see generally Chang, 35 Cal. Rptr. 2d at 70-71.

22

If Ms. Castillo held the Proceeds pursuant to an express trust for Mr. Juarez's benefit, Mr. Juarez still held that beneficial interest in the Proceeds notwithstanding the May 31 Transfer. In other words, to the extent an express trust existed, the May 31 Transfer did not transfer anything of value from Mr. Juarez to Ms. Castillo. Simply put, it is difficult to reconcile Mr. Akers' case for an express trust with the bankruptcy court's prior Fraudulent Transfer Judgment.

Given the above-referenced circumstances, we conclude that Ms. Castillo was prejudiced by the bankruptcy court's erroneous exclusion of her additional evidence. Accordingly, we must VACATE the bankruptcy court's § 523(a)(4) ruling and REMAND for further proceedings.[18]

**B. Section 727(a) objection to discharge ruling.**

In his cross-appeal, Mr. Akers has asked this Panel to review the "facts and evidence in this case" and to hold that the bankruptcy court erred in denying him any relief on his § 727(a) claims. See Aple. Opn. Brf. (Sept. 27, 2011) at p. 31. Mr. Akers in essence has argued on appeal that the record does not

---

[18]Mr. Akers also argued that we should have dismissed Ms. Castillo's appeal because she did not provide us with all necessary transcripts. While there is no question that Ms. Castillo should have provided us with the missing transcripts and that such transcripts would have facilitated our review, we decline to dismiss on this basis because we were able to conduct a meaningful review without the transcripts. See Kyle v. Dye (In re Kyle), 317 B.R. 390, 393-94 (9th Cir. BAP 2004), aff'd, 170 Fed. Appx. 457 (9th Cir. 2006) (holding that, so long as record permits meaningful review, failure to provide all required transcripts need not result in dismissal or summary affirmance, and the appellate court has discretion to disregard the defect and decide the appeal on the merits).

23

support the bankruptcy court's dispositive findings that the Castillos' testimony was credible and that any errors or omissions by the Castillos in their bankruptcy case resulted from inadvertence rather than intentional deceit.

Because Mr. Akers' cross-appeal challenged the bankruptcy court's dispositive factual findings, it was incumbent upon him to demonstrate how those findings were clearly erroneous, and he needed to provide us with the bankruptcy court's findings and all evidence upon which those findings were based. Burkhart v. Fed. Dep. Ins. Corp. (In re Burkhart), 84 B.R. 658, 660 (9th Cir. BAP 1988). Failure to provide necessary transcripts may be grounds for dismissal or summary affirmance of the appeal. See, e.g., Jones v. City of Santa Monica, 382 F.3d 1052, 1057 (9th Cir. 2004) (dismissing portion of appeal dependent on hearing transcripts not provided); Syncom Capital Corp. v. Wade, 924 F.2d 167, 169 (9th Cir. 1991) (dismissing appeal based on appellant's failure to provide necessary trial transcript); see also In re Kyle, 317 B.R. at 393 (stating that "failure to provide a sufficient record to support informed review of trial-court determinations may, but need not, lead either to dismissal of the appeal or to affirmance for inability to demonstrate error.").

While we often attempt to conduct some measure of review in the absence of necessary transcripts, see, e.g., In re Kyle, 317 B.R. at 393-94, we cannot do so here. Mr. Akers' only assignment of error in his cross-appeal concerns the bankruptcy court's dispositive findings on the § 727(a) claims, and we simply cannot meaningfully consider those findings without the January 26, 2011 trial transcript.

24

Under appropriate circumstances, when we are confronted with a materially incomplete record, including the absence of essential transcripts, we may either dismiss the appeal or summarily affirm. Id. We acknowledge that, before we do so, we typically consider whether some judicial action short of dismissal or summary affirmance is justified in light of the circumstances presented. See Ehrenberg v. Cal. State Fullerton (In re Beachport Enter.), 396 F.3d 1083, 1087 (9th Cir. 2005). When considering what action to take, we ordinarily look at the impact of the sanction and the possibility of employing alternate sanctions. Id. We also assess whether the appellant or his or her counsel is more responsible for the procedural noncompliance. Id.

However, as Beachport itself pointed out, when the noncompliance with procedural rules is "egregious" an explicit discussion of alternative sanctions is unnecessary. Id. at 1087. "Egregious" is precisely how we would describe Mr. Akers' failure to supply the January 26, 2011 trial transcript. Mr. Akers was well aware of the requirement to provide necessary transcripts. In fact, he argued on appeal that Ms. Castillo's failure to provide such transcripts should result in dismissal of her appeal.[19] Less than two pages earlier, he had argued in his appellate brief that we should overturn the bankruptcy court's § 727(a) ruling, which hinged solely on the court's findings regarding the Castillos' credibility and their intent. We simply

---

[19]As it turned out, we were able to conduct a meaningful merits review of her appeal without all of the requisite transcripts. See n.17, supra. The same cannot be said for our ability to conduct a merits review of Mr. Akers' appeal.

25

cannot fathom how Mr. Akers expected us to address the merits of his appellate argument without the January 26, 2011 trial transcript.

Furthermore, we explicitly warned both parties in an order we issued on December 29, 2011, that the failure of either party to provide us with necessary transcripts could result in dismissal or summary affirmance of either or both of the cross-appeals. Yet Mr. Akers still took no action to provide us with the transcript we needed to address his cross-appeal from the § 727(a) ruling.

Under these circumstances, we consider it appropriate to summarily affirm the bankruptcy court's § 727(a) ruling.

**CONCLUSION**

For the reasons set forth above, we VACATE AND REMAND the bankruptcy court's § 523(a)(4) ruling, and we AFFIRM the court's § 727(a) ruling.